# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**LEN TOBIAS,**
   Plaintiff,

**v.**

**TEREX USA, INC., and**
**POWER SCREEN USA, LLC,**
   Defendants.

**CASE NO.: 20-cv-13333**

**PLAINTIFF DEMANDS A JURY**

Collin H. Nyeholt (P74132)
LAW OFFICES OF
CASEY D. CONKLIN, PLC
4084 Okemos Road, Ste B
Okemos, MI 48864
(517) 522-2550
collin@caseydconklin.com

_____

## COMPLAINT and JURY DEMAND
_____

## JURISDICTION AND VENUE

1. This is a claim for violation of the the Americans with Disabilities Act of 1990, 42 USC § 12101 *et seq*, as amended by the ADA Amendments Act of 2008, Pub L No 110-325, 122 Stat 3553 (2008), and Michigan's Persons with Disabilities Civil Rights Act, MCL § 37.1101 *et seq*.

2. Plaintiff LEN TOBIAS is, and at the time of the events described in this complaint was, a permanent resident of the Eastern District of Michigan. His principal place of employment, at the time of the events described in this Complaint, was at a certain manufacturing facility owned, operated, and maintained by Defendants in Durand.

3. Defendant TEREX USA, INC ("Defendant Terex") is a for-profit corporation organized under the laws of, and with principal place of business within, the State of Delaware. Defendant Terex manages and reports its business in two segments: Aerial Work Platforms (AWP) and Materials Processing (MP). The MP division has several significant manufacturing operations including crushing and screening equipment which is manufactured in Durand, Michigan. Plaintiff was employed at Defendant Terex' Durand, Michigan facility.

4. Defendant POWER SCREEN USA LLC ("Defendant Power Screen") is a for-profit Limited Liability Company organized under the law of, and with principal place of business within, the State of Kentucky. This business entity does business

in the State of Michigan under certain assumed names it has registered with the Michigan Department of Licensing and Regulatory Affairs, including "Terex Simplicity" and "Simplicity Engineering, Inc." At the time of the events described in this Complaint, plaintiff's pay stubs and annual W-2 forms were issued by Defendant Power Screen who was identified as the "employer" thereon. At the time of the events described in the Complaint, Plaintiff's employment was governed by a certain Collective Bargaining Agreement between "Simplicity Engineering, Inc" (the d/b/a for Defendant Power Screen) and the UAW Local 743.

5. Defendant Power Screen provides labor to business facilities operated by Defendant Terex including the facility in Durand where Plaintiff was employed. There is substantial common ownership and financial control between Defendants Terex and Power Screen with respect to the Durand facility. There is virtually no distinction between the operations of the two business entities and they are so integrated and interrelated, with respect to their employment of individuals including Plaintiff, that the Defendants may be viewed as a single employer or integrated enterprise. There is centralized control over labor relations between Defendants Terex and Power Screen. For this reason, Defendants Terex and Power Screen are jointly and severally liable for Plaintiff's claim of employment

3

discrimination stated herein. *See eg Swallows v. Barnes Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997).

6. This claim stems from the Defendants' actions towards Plaintiff during the course of his employment that occurred in Durand, Michigan and within the geographical bounds of this Court.

7. This Court may exercise *general in personem* jurisdiction over the Defendants by reason of their permanent business presence within the Eastern District of Michigan. In the alternative, the Court may exercise *specific jurisdiction* over the dispute because the transaction or occurrence giving rise thereto resulted from Defendants' business activities within, and directed towards, the Western District of Michigan.

8. Plaintiff is a domiciliary of Michigan, and not of Kentucky or Delaware. Defendants are, respectively, domiciliaries of Kentucky and Delaware and, in any event, not of Michigan. By reason of the diversity of the parties, this Court may exercise jurisdiction over this dispute by reason of 28 USC § 1332.

9. This Court may also exercise jurisdiction over the claim pursuant to 28 USC § 1331 and jurisdiction over the related state claims by reason of 28 USC § 1367.

10. Venue is properly laid in this forum pursuant to 28 USC §§ 1391(b)(1) and (b)(2).

## ALLEGATIONS

11. Plaintiff Len Tobias began his employment at Defendants' facility in Durand, Michigan in 2006. As of his termination in 2018, he was employed as a machine operator.

12. Plaintiff suffers from emphysema and COPD. These conditions affect several of his major life activities, including breathing and working.

13. Plaintiff's emphysema and COPD result in occasional flare-ups. During a flare-up, Plaintiff experiences severe and worsening tightness in the chest and an overall inability to catch his breath. It feels like drowning. A prolonged flare-up can result in severe complications, including death.

14. Plaintiff has observed that he often suffers flare-ups when he gets hot, or when he is wearing clothing that is tight and restrictive on his chest. He has also observed that when he suffers a flare-up, removing tight clothing from his chest area and cooling down can help alleviate same. He wears loose fitting shirts to avoid flare-ups. When he suffers a flare-up, he has found that removing his shirt helps him to regain his breath.

15. Plaintiff regularly uses two different inhalers, one of which is a rescue inhaler. He also has a bag of various pills he carries with him and takes daily to manage the condition. While employed with the Defendants, he used his inhaler

and took his pills almost daily while at work. In addition, he frequently mentioned his emphysema and COPD to coworkers and managers over the years.

16. On the Morning of August 28, 2018 Plaintiff exerted himself performing some housework before work and this caused a flare-up. He began suffering from tightness in his chest and difficulty breathing. Plaintiff's wife, concerned, suggested that he call in from work, but Plaintiff was concerned about accruing attendance points and so he decided to go to work. He chose clothing which he thought would avoid exacerbating the problem: a loose fitting shirt and a pair of bib overalls. The bib overalls were a tactical decision because they would allow him to cover up his chest while removing the shirt if it became too restrictive.

17. Plaintiff set out for work. In the car, he turned the air conditioning on high to try to cool off and alleviate the flare-up. When that did not work, he removed his shirt and placed it in his lunch cooler.

18. When Plaintiff arrived at work, the flare-up had not subsided but had worsened. He could not catch his breath. He began to feel light headed.

19. Plaintiff came in the back of the shop closest to his work station, set his lunch pail which contained his shirt next to his work station, and made his way to the locker area to listen to the morning safety meeting. He still felt light headed. So, he hunched over and put his head down to concentrate on breathing.

20. Plaintiff's supervisor, Kevin Kelly, typically stood in the locker area in the morning to watch people punch in.

21. Kelly observed Plaintiff hunched over in the locker area, struggling for breath.

22. Kelly had watched Plaintiff use his rescue inhaler nearly every day while working with him, and Plaintiff had mentioned his emphysema to him before. He was well aware he had breathing problems.

23. Kelly did not inquire if Plaintiff needed any medical assistance. Instead, he demanded that Plaintiff put a shirt on. Plaintiff replied that he was having difficulty breathing, and that he would put the shirt on as soon as he could catch his breath.

24. Though he could plainly see that Plaintiff was having severe difficulty breathing, Kelly did not proceed to call 911 or take any other action to care for the worsening medical emergency. Instead, he continued with the morning safety meeting.

25. Plaintiff proceeded to listen to the morning safety meeting, and then proceeded to his work station. He used his rescue inhaler. He immediately turned the fan on, in an attempt to cool down and let the inhaler kick in. Supervisor Kevin Kelly approached him again at this point and again ordered him to put on his shirt. Plaintiff told Kelly that he couldn't because "I can't get rid of this tight-chest feeling" but promised he would when it passed.

26. That was not good enough, and Kelly ordered Plaintiff to immediately sit down and put his shirt on. Plaintiff sat down, cut a hole in the neck and ripped the sides of the shirt to loosen it, and put it on as instructed.

27. Kelly continued to argue with Plaintiff, stating that the shirt he had on, due to the alterations, "did not meet codes."

28. There are no "codes" that prevent a person from wearing a cut-off shirt at their work station. Machine operators like Plaintiff at the Durand plant frequently wear tank tops and sleeveless shirts to work. Kelly is well aware of this and permits them to do so.

29. Plaintiff was, eventually, called to the office for a meeting with his UAW representative and HR Manager Kristen Weaver. During this meeting, he expressed that his need to wear loose fitting clothing was to prevent overheating and a continued flare-up of his COPD. He was nevertheless ordered to leave work and return with a different shirt on.

30. Plaintiff proceeded to the nearby Meijer store and purchased a different work shirt. His flare-up, finally, subsided and he returned to work for the remainder of the day in a black sleeveless tank top shirt.

31. On August 29, 2018 Plaintiff arrived for his next scheduled shift.

32. Fearing additional breathing problems, Plaintiff chose to wear an orange tank top style shirt for the day.

8

33. At or about 7:00 AM, Plaintiff encountered Kevin Kelly in the coat area and chose to confront him about the incident the day before. Kelly was in the process of going over a safety sheet. Plaintiff told Kelly that he did not really believe in safety because, if he did, he would not have treated someone complaining of breathing problems the way he did but, instead, should have called 911.

34. All, or part, of the conversation about was witnessed by Steve Broderson and Jim Hall and they both prepared written statements attesting to same.

35. Jim Hall's written statement indicated that during this conversation, Tobias had expressed concerns to Kelly about a "medical thing."

36. After the exchanges above, Plaintiff proceeded to his work station. While standing there working, a bee flew at him. In the course of avoiding the insect, Plaintiff's shirt became snagged on his machine and was ripped.

37. At or about 8:24 AM, Plaintiff had a conversation with Jeremy Perez, another of his managers. Perez expressed doubt that Plaintiff had any medical conditions and Plaintiff proceeded to show him his rescue inhaler and his bag of pills and said "how dare you not believe me." During the exchange, Perez opined that there is "no way a doctor told you that you had to take off your shirt" to which Plaintiff responded by pointing out that he is not a doctor.

38. At 9:25 AM Plaintiff was called to a meeting with several of Defendant's managerial staff including:

9

    a. Kevin Kelly, Plaintiff's immediate supervisor,

    b. Jeremy Perez, another of Plaintiff's supervisors,

    c. Kristen Weaver, Defendants' HR Manager,

    d. Christopher Konen, Defendant's HSE Manager.

39. Plaintiff's UAW representative was also called to the meeting.

40. During this meeting, Plaintiff specifically stated that he suffered from emphysema, and that he had for 20 years. He explicitly made the complaint that Kevin Kelly was aware of his emphysema and was harassing him for it. He specifically stated that he needed to be permitted to remove his shirt in a flare-up, and to wear less restrictive shirts or otherwise have access to appropriate cooling to avoid future flare-ups. Perez again expressed his amateur opinion that no doctor would require such, and in response Plaintiff demanded to know if any of those present were familiar with emphysema or were themselves doctors.

41. After the conversation, Plaintiff was placed on suspension pending an investigation of his actions.

42. During the investigation, Defendant's managers concocted a story that Plaintiff had *intentionally* cut holes in the shirt he was wearing in order to "expose his nipples."

43. Defendant Terex Simplicity's labor agreement with Plaintiff's union provides for progressive discipline. Defendant Terex's employee manual provides

that failure to wear appropriate personal protective equipment results only in a verbal warning for the 1st and 2nd occurrence, and a written warning for the 3rd occurrence withing a 12-month rolling. Only after the 4th occurrence in a rolling 12-month period does it result in suspension and/or grounds for termination.

44. On September 11, 2018 he was terminated from his position at Terex, supposedly, for failure to wear appropriate safety gear because of the holes in the shirt.

45. In advancing Plaintiff directly to termination, based on the events of August 28, 2018, Defendant Terex violated the Collective Bargaining Agreement and its progressive discipline policy.

46. Plaintiff's union grieved his termination but Terex refused to reverse his termination or consider lesser discipline and the Union elected not to take the matter to arbitration.

47. Plaintiff timely filed a charge of discrimination with the Michigan Department of Civil Rights which, through the work sharing agreement, simultaneously initiated a charge of discrimination with the EEOC.

48. On October 2, 2020 the EEOC issued its "right-to-sue" letter in Plaintiff's charge of discrimination number 23A-2019-00270.

**COUNT 1 – DISABILITY DISCRIMINATION**
*In Violation of the Americans with Disabilities Act,*
*42 USC § 12101 et seq, as amended*

49. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

50. Defendant employed 15 or more employees, including part time employees, for each workday in each of 20 or more calendar weeks in the current or proceeding year of the date of Plaintiff's termination and is, therefore, a "covered employer" as that term is defined by 42 USC § 12111(5)(A) and is a "covered entity" as that term is used in 42 USC § 12111(2).

51. At the time of the events described in this Complaint, Plaintiff suffered from a disability: emphysema and COPD.

52. These conditions affected, and continue to affect, several of Plaintiff's major life activities including breathing and working.

53. Defendants' were aware of Plaintiff's disabilities.

54. Even if not specifically aware of his diagnosis, Defendants' managers regarded Plaintiff as suffering from a disability affecting his ability to breath and work.

55. Plaintiff is and was a qualified individual with a disability as that term is defined by 42 USC 12102(1).

56. Plaintiff possessed the appropriate educational background, employment experience, skills, and other requirements for the position he occupied.

57. Plaintiff, in fact, satisfactorily performed and even excelled in this position prior to his termination.

58. Plaintiff could perform the essential functions of his position. He demonstrated this fact by performing the work successfully for twelve years prior to his termination.

59. Plaintiff was subjected to the following adverse employment actions related to his disability:

    a. Failure to accommodate his disability,

    b. Failure to engage in the interactive process to provide disability accommodations,

    c. Termination based, at least in part, upon unlawful consideration of his disabling condition.

60. On August 28th, 2018 Plaintiff disclosed his disability (emphysema/COPD) to his immediately Supervisor, Mr. Kelly. And, he requested that he accommodate his disability by permitting him to wear a loose-fitting shirt so as not to exacerbate the flare-up he was suffering related to same. Mr. Kelly refused to provide the requested accommodation. He also failed and refused to engage Plaintiff in the mandated interactive process to provide an alternative suitable accomodations.

61. On August 29th, 2018 Plaintiff disclosed his disability (emphysema/COPD) to multiple members of Defendant's management. And, he requested that they

provide him accommodations for same by permitting him to wear loose-fitting clothing during an attack. Defendants' failed and refused to provide the requested accommodation. At this point, they had an obligation to engage Plaintiff in the ADA interactive process to provide an alternative accommodation. They failed to do so and, instead, proceeded to terminate his employment.

62. In so terminating Plaintiff, Defendants ignored the progressive discipline policy applicable to him and other employees.

63. Defendants chose to terminate Plaintiff, at least in part, to avoid having to provide ADA-mandated accommodations for his disability.

64. Plaintiff has suffered the following damages as a result of the Defendants' violation of his rights:

    a. Lost back pay and benefits,

    b. Lost front pay and benefits,

    c. Emotional pain and distress,

    d. Attorney's fees in opposing same.

65. Plaintiff is also entitled to compensatory and punitive damages by reason of the Defendants' violation of the Americans with Disabilities Act.

**COUNT 2 – DISABILITY DISCRIMINATION**
*In Violation of the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 et seq*

66. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

67. Michigan's Persons with Disabilities Civil Rights Act (the "PWDCRA") prohibits employers from discriminating against a qualified employee with disability and is largely coextensive with the Americans with Disabilities Act. The PWDCRA, like the ELCRA, is largely coextensive with the ADA. *Elezovic, supra.*

68. As stated previously, Defendants have engaged in a pattern of discrimination towards him based, at least in part, on his disability.

69. As stated previously, Defendants refused Plaintiff's reasonable request for disability accommodations.

70. As noted, Defendants terminated Plaintiff's employment for a pretextual reason, rather than provide him with requested disability accommodations.

71. Plaintiff has suffered the following damages as a result of the Defendants' violation of his rights:

    a. Lost back pay and benefits,

    b. Lost front pay and benefits,

    c. Emotional pain and distress,

    d. Attorney's fees in opposing same.

## COUNT 3 – RETALIATION
### *In Violation of the Americans with Disabilities Act 42 USC § 12101 et seq, as amended*

72. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

73. The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." Further, the ADA makes it unlawful to "coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 USC § 12203(b).

74. Plaintiff engaged in activity protected by the ADA when he:

   a. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on or about August 28, 2018,

   b. Complained to Kevin Kelly about perceived disability-discrimination on August 29, 2018,

   c. Complained to other management about Kevin Kelly's ongoing disability discrimination and harassment on August 29, 2018,

    d. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on August 29, 2018.

75. The Defendant retaliated against Plaintiff for the protected conduct above by

    a. Disregarding its progressive disciplinary policy and applying discipline to Plaintiff in an unfair and uneven manner,

    b. Developing a pretext to terminate his employment, by falsely asserting he had intentionally cut holes in his shirt as an act of "insubordination," and

    c. Terminating Plaintiff's employment based, at least in part, upon consideration of his protected conduct.

76. Plaintiff has suffered the following damages as a result of the Defendants' violation of his rights:

    a. Lost back pay and benefits,

    b. Lost front pay and benefits,

    c. Emotional pain and distress,

    d. Attorney's fees in opposing same.

## COUNT 4 – RETALIATION
*In Violation of the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 et seq*

77. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

78. Michigan's PWDCRA prohibits an employer from retaliating or otherwise discriminating against an employee who opposes a violation of the Act, or participates in an investigation into violation of the same.

79. Plaintiff engaged in activity protected by the PWDCRA when he:

    a. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on or about August 28, 2018,

    b. Complained to Kevin Kelly about perceived disability-discrimination on August 29, 2018,

    c. Complained to other management about Kevin Kelly's ongoing disability discrimination and harassment on August 29, 2018,

    d. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on August 29, 2018.

80. The Defendant retaliated against Plaintiff for the protected conduct above by

    a. Disregarding its progressive disciplinary policy and applying discipline to Plaintiff in an unfair and uneven manner,

    b. Developing a pretext to terminate his employment, by falsely asserting he had intentionally cut holes in his shirt as an act of "insubordination," and

    c. Terminating Plaintiff's employment based, at least in part, upon consideration of his protected conduct.

81. Plaintiff has suffered the following damages as a result of the Defendants' violation of his rights:

   a. Lost back pay and benefits,

   b. Lost front pay and benefits,

   c. Emotional pain and distress,

   d. Attorney's fees in opposing same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief from this Honorable Court:

1. ECONOMIC DAMAGES including, but not necessarily limited to, back pay and benefits and front pay and benefits, lost by Plaintiff resulting from his wrongful termination.

2. Such other COMPENSATORY damages as may be appropriate to compensate Plaintiff for Defendant's unlawful conduct, to the statutory maximum of $300,000.

3. PUNITIVE damages, in whatever amount the Court should deem appropriate, pursuant to 42 USC § 1981a(b)(3).

4. ATTORNEY'S FEES, in an amount determined reasonable by the Court, so wrongfully incurred in order to remedy the violation of his rights described herein, pursuant to the various statutes identified herein,

5. Pre and post judgment interest at the appropriate statutory rate, and

6. Such other relief as this Court may deem just and appropriate in law or in equity.

### PLAINTIFF DEMANDS A JURY

                              Respectfully Submitted,

Dated: 12/14/2020                            __/s/ Collin H. Nyeholt_____
                                                     Collin H. Nyeholt,
                                                     Attorney for the Plaintiff