UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEN TOBIAS,

       Plaintiff,

v.                                     Civil Case No. 20-13333

TEREX, USA INC., *et. al.*,          Sean F. Cox
                                         United States District Court Judge

       Defendants.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a workplace discrimination suit. Plaintiff, Len Tobias ("Plaintiff") alleges that Defendant, Terex USA, Inc. ("Terex") and Power Screen USA, LLC ("Power Screen") (collectively "Defendants"), discriminated against him based upon his disability. The matter currently before the Court is Defendant's Motion for Summary Judgment, brought pursuant to FED. R. CIV. P. 56. (ECF No. 23). The motion has been fully briefed, and a hearing was held on August 18, 2022. For the reasons explained below, the Court:

- GRANTS Defendants' motion as to Count I (Disability Discrimination in violation of the ADA) because (1) Plaintiff failed to exhaust his administrative remedies under the ADA as to the failure to accommodate and failure to engage in the interactive process claims and (2) there is no genuine issue of material fact as to the unlawful termination claim;

- GRANTS Defendants' motion as to Count II (Disability Discrimination in violation of the PWDCRA) because there is no genuine issue of material fact as to the failure to accommodate and unlawful termination claims;

- GRANTS Defendants' motion as to Count III (Retaliation in violation of the ADA) because Plaintiff failed to exhaust his administrative remedies under the ADA;

- GRANTS Defendants' motion as to Count IV (Retaliation in violation of the PWDCRA) because there is no genuine issue of material fact; and

- DISMISSES this action with prejudice.

## BACKGROUND

On December 21, 2020, Plaintiff commenced this action. Plaintiff's complaint includes four counts: (1) disability discrimination in violation of the Americans with Disabilities Act 42 U.S.C. § 12101, *et seq* ("ADA") (Count I); (2) disability discrimination in violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101, *et seq* ("PWDCRA") (Count II); (3) retaliation in violation of the ADA (Count III); and (4) retaliation in violation of the PWDCRA (Count IV).

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order and provide, consistent with FED. R. CIV. P. 56 (c) that:

a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order, ECF No. 7, at PageID 101).

The parties complied with the Court's practice guidelines for summary judgment motions. Defendant filed a "Statement of Material Facts Not In Dispute" ("Def's Stmt") (ECF No. 23, at PageID 181-198) and Plaintiff filed a "Counter-Statement of Disputed Facts" ("Pl' s Stmt") (ECF No. 27-1).

Plaintiff began working for Terex as a welder at Terex Simplicity's engineering facility in Durand, Michigan on or about February 2, 2006. (Def's Stmt at PageID 181). As a part of his application for employment at Terex, Plaintiff agreed to the following:

> In the event of my employment, I will comply with all rules and regulations as a set forth in the Company's policy manuals or other communications distributed to employees.

(Def's Stmt at PageID 181). Upon becoming an employee of Terex, Plaintiff received a copy of the Company's Shop Rules and Regulations, as well as the Safety Rules. (Def's Stmt at PageID 181). Plaintiff understood that it was his responsibility, as an employee of Terex, to understand and be familiar with the company's Shop Rules and Regulations at all times. (Def's Stmt at PageID 181).

The Shop Rules that were in effect at the time of Plaintiff's suspension in August 2018 and termination in September 2018 identified the following relevant rules, violations of which could result in disciplinary actions "in the judgment of the Management:"

Rule 8.      Refusal to obey orders of supervision (discharge).

Rule 19.     Immoral conduct or indecency. (suspension up to discharge).

Rule 15.     Restricting Output.

| Rule 29. | Threatening, intimidating, coercing or interfering with employee or supervision at any time. (layoff to discharge). |
|---|---|
| Rule 30. | Distracting the attention of others, or causing confusion by unnecessary shouting, catcalls, or demonstration in the plant. |
| Rule 34. | The making or publishing of false, vicious or malicious statements concerning any employee, supervisor, the Company or its products. |

(Def's Stmt at PageID 182; ECF No. 23-5). The Shop Rules also outlined the generally applicable progressive discipline procedure, and identified specific rules that were subject to an accelerated disciplinary progression, including certain rule violations that provided for an immediate discharge. (Def's Stmt at PageID 182). Plaintiff was aware of these rules, and understood that violations of these rules may result in discipline ranging from suspension, layoff, and up to termination. (Def's Stmt at PageID 182).

Throughout his employment with Terex, Plaintiff was represented by the UAW Local 743 and served in an administrative function for the union with responsibilities for enforcing the terms of the collective bargaining agreement "quite a few times." (Def's Stmt at PageID 183). Article 9 of the 2016 Collective Bargaining Agreement, which was in effect in summer 2018, provided that Terex may establish work rules consistent with generally accepted conduct in the industry, and that violations of these rules may results in disciplinary actions. (Def's Stmt at PageID 183; ECF No. 23-6).

In addition to the Shop Rules, Plaintiff was periodically provided with an updated copy of the Terex Team Member Handbook. (Def's Stmt at PageID 183). In signing the "Terex Team Member Handbook: Acknowledgment of Receipt and Understanding," Plaintiff expressly agreed that it was his responsibility to review and understand all updated policies upon receipt. (Def's Stmt at PageID 183).

In Section 2.4 of the 2018 Terex Team Member Handbook, Terex provided the following guidance to its employees under the heading "Reasonable Accommodation of Disabilities:"

> If you have a disability and believe that you need a reasonable accommodation, you should discuss it with a Human Resources representative, who will explore with you the availability of reasonable accommodations for your disability that do not pose an undue hardship on the Company.

(Def's Stmt at PageID 183-184). Plaintiff also acknowledged that a disability-related informational poster required by the State of Michigan was visible in various locations in the worksite. (Def's Stmt at PageID 184).

Plaintiff was first diagnosed with emphysema and chronic obstructive pulmonary disease ("COPD") in 1996 at an urgent care facility. (Def's Stmt at PageID 184). Despite this diagnoses, Plaintiff only identified "Missing Left Thumb" as the nature of his handicap on the General Information Sheet that he submitted to Terex in April 2006. (Def's Stmt at PageID 184-185).

Plaintiff did not ask his family physician, Dr. Anthony Patsy, to notify Terex of his COPD or otherwise recommend a reasonable accommodation for his condition. (Def's Stmt at PageID 185). To the extent that Terex received any communication from health care professionals, including Dr. Patsy, regarding Plaintiff during his employment at Terex, these communications made no mention of Plaintiff's COPD, and did not recommend any limitations, restrictions, or accommodation relative to Plaintiff's breathing. (Def's Stmt at PageID 185).

Plaintiff testified that a Human Resources Manager, Kristen Weaver ("Weaver"), helped him with his insurance coverage and that she knew about his COPD because "it was all a part of [his] medication." (ECF No. 23-2, at PageID 269). Plaintiff also testified that he told his immediate supervisor, Kevin Kelly ("Kelly"), that he had emphysema and COPD. (ECF No. 23-2, at PageID 255).

Apart from his verbal statements to Kelly, he did not provide Terex with any document that would have informed the company of his diagnoses and any accompanying restrictions, or recommended accommodation for his COPD. (Def's Stmt at PageID 187).

Until the morning of August 28, 2018, Plaintiff neither requested nor required any accommodation in over twelve years that he worked for Terex. (Def's Stmt at PageID 187).

Plaintiff testified that prior to August 2018, he "was coming down with anger issues, trouble concentrating, stressed out." (ECF No. 23-2, at PageID 236). Plaintiff did not specifically associate his anger to any specific diagnoses or condition, but rather that he associated these issues with "everything" including his history of strokes. (ECF No. 23-2, at PageID 236).

On April 21, 2017, Plaintiff was cited for raising his voice, interfering and disrupting the meeting on the plant floor, and refusing the supervisor's direction and was terminated for violations of Shop Rules 8, 29, 30 (ECF No. 23-12). Regarding this incident, Plaintiff testified that "[he] had to leave and [he] had to leave right now to go get [his son] off the bus" and that "he got upset. [He] was mad, because [he] had to go because [he] don't like getting in trouble from the school." (ECF No. 23-2, at PageID 250).

The UAW grieved the termination, and by a memorandum executed by the union representative and Weaver on June 12, 2017, Plaintiff was reinstated with an agreement that he will remain on a 12-month last chance probation for violations of Shop Rules 29, 30, and 34 (Pl's Stmt at PageID 189). Regarding the negotiated condition for his reinstatement, Plaintiff testified that he "was given one year to keep my mouth shut, that's what they told me." (ECF No. 23-2, at PageID 246).

In June or July 2018, Plaintiff "lost [his] cool" and "got upset" during a meeting because Weaver declined his request to forward her notes to Plaintiff's psychiatrist. (ECF No. 23-2, at PageID 250). Regarding this meeting, Plaintiff testified:

> I don't know what happened in that meeting. I can't remember. The only thing I remember is I was getting mad, and I got frustrated, and it was something that I been doing good for a long period of time, and something blew. It was just something blew that minute.

(ECF No. 23-2, at PageID 251).

On August 28, 2018, Plaintiff arrived to work without wearing a shirt, only wearing his bib overalls. (ECF No. 23-2, at PageID 252-253). Plaintiff testified that he did so because he was experiencing a COPD flareup and the bib was breathable:

> Q. But you made a tactical decision that morning to wear bib overalls because they would allow you to cover up your chest while removing your shirt right?
>
> A. I - - yeah, because I figured that's what they were always talking about your chest.
> My bibs - - my bibs cover up my whole chest, just no different than - - than a tank top, a loose-fitting tank top. So, I see no difference. And my bibs are breathable, and I brought the shirt with me so I could wear it as soon as it calmed down.

(ECF No. 23-2, at PageID 262).

Once he arrived to work, Plaintiff disclosed his disability of emphysema and COPD to Kelly, and Plaintiff told Kelly that he was "having an emphysema attack or a COPD attack, and I'm trying to get my shit together - - get together[.]" (ECF No. 23-2, at PageID 271). Plaintiff testified: "then [Kelly] asked [Plaintiff] if [he] would put a shirt on, and it took [Plaintiff] a little while to talk, and [Plaintiff] told him yes [he] would as soon as [he] get back to my lock - - back to [his] workstation." (ECF No. 23-2, at PageID 271).

7

Once Plaintiff returned to his workstation, he turned on the fan above his head. (ECF No. 23-2, at PageID 271). When Kelly "came back out there[,]" Plaintiff "grabbed [his] shirt, [he] was holding it and stuff, and [he] was still having issues." (ECF No. 23-2, at PageID 271). Then Kelly invited Plaintiff to go upstairs to the air-conditioned office to "cool off[.]" (ECF No. 23-2, at PageID 271). Plaintiff "declined because the fan was doing [him] so much better, just standing in that fan, and [Plaintiff] was just taking [his] breaths, and it was just - - it was doing better than even what the air conditioning in the car did on the way there[.]" (ECF No. 23-2, at PageID 271).

Kelly again reminded Plaintiff that he needed to put his shirt on while he was at his workstation. (ECF No. 23-2, at PageID 191). Plaintiff responded, "Just wait a minute. Wait a minute until I get my stuff together. Let me get my stuff together. Let me get me together, and then I will." Kelly "just kept on[,]" so Plaintiff "ripped the sides of [the shirt] down the sides and the neck, and then [he] put that on and wore that" because the shirt was too tight. (ECF No. 23-2, at PageID 271).

Kelly told Plaintiff that his shirt, as torn and altered, was unacceptable as it did not meet the dress code. (Def's Stmt at PageID 192). Plaintiff disagreed with Kelly's assessment. (Def's Stmt at PageID 192).

Plaintiff was then sent to the Human Resources Office to discuss the matter with Weaver and Perez. (Def's Stmt at PageID 192). Perez addressed the company's dress code expectations with Plaintiff and allowed him to go home and return with a proper shirt. (Def's Stmt at PageID 192).

Plaintiff returned with another shirt (lighter-colored shirt with a circle design) with both sides intact and a relatively shallow tear at the neck. (Def's Stmt at PageID 192). There was no further incident on August 28, 2018. (Def's Stmt at PageID 192).

Plaintiff testified that the accommodation he needed "for that day" on August 28, 2018, was that he be permitted to wear a loose-fitting shirt when experiencing a flare-up. (Def's Stmt at PageID 192). Plaintiff also testified that the accommodation he needed "at that point" on August 28, 2018, was for Kelly to leave Plaintiff "alone" and simply "let the fan do what it needed for [him] at that time." (Def's Stmt at PageID 193).

On the next day, August 29, 2018, Kelly emailed Weaver and Perez stating:

Len Tobias showed for work this morning dressed with bibs and no shirt. I let him know that he needed to have a shirt on working around machinery and hot metal chips. Len stated he couldn't breathe with a shirt on because of health issues and the weather. He did have a tee shirt with him and again let him know he needed a shirt for safety and he couldn't work without one. He then said he would cut the shirt he had into a tank top and I left the area at that time. I talked to Jeremy after our 7:45 meeting about the situation. I then went back to Len around 9:45 and let him know he needed to go home and get a shirt as he still was not covered and he stated we were harassing him because other people were wearing shirts without sleeves and tank tops I told him that a sleeveless shirt was fine but he needed a shirt. He said if he left he would not come back and then said he was fine with the way he was dressed and he was going to work. I told him he needed to come up to human resources with me and he again said we were harassing him and then walked across the aisle hollering he wanted all of the committee and pointed at Brandon Simmons saying he wanted him and Tony Cole and then pointed at myself and Chris Konan saying we were harassing him.

(ECF No. 23-17, at PageID 393).

During the safety meeting on August 29, 2018, Plaintiff confronted Kelly in front of his colleagues and told Kelly that he "didn't believe in safety" and that he "should have called 911" the previous day. (ECF No. 23-2, at PageID 263, 272).

Plaintiff testified that later in the day, a bee flew at him and caused him to move in such a way that his shirt became snagged and ripped hole around his nipples. (ECF No. 23-2, at PageID 264, 267). Because Plaintiff refused to go home and come back with an appropriate shirt, Kelly directed Plaintiff to accompany him to Human Resources.

At this meeting with Human Resources, Plaintiff told Kelly, Perez, Weaver, and Human Safety Representative Christopher Konen ("Konen") that he had been medically diagnosed with emphysema and COPD over 20 years ago. (Def's Stmt at PageID 194). Plaintiff testified that he blew up and was talking loud during the meeting. (ECF No. 23-2, at PageID 265).

Plaintiff was then placed on suspension pending investigation, which was converted to a termination on September 11, 2018 upon completion of the company's investigation. (Def's Stmt at PageID 195). The Corrective Action Reports regarding the matter state that he was terminated for violations of Shop Rules 8, 15, 19, 29, 30, and 34, which included insubordination. (ECF No. 23-20).

The UAW grieved the termination in accordance with the Grievance Procedure under the Collective Bargaining Agreement, which grievance was denied as the final step on October 9, 2018. (Def's Stmt at PageID 195). The UAW did not pursue Plaintiff's grievance to arbitration. (Def's Stmt at PageID 195). As a part of the grievance process, Plaintiff prepared an 11-page handwritten statement on September 30, 2018. (Def's Stmt at PageID 195; ECF No. 23-14).

On December 11, 2018, Plaintiff contacted the Michigan Department of Civil Rights ("MDCR") to file a complaint. (Def's Stmt at PageID 196). The initial intake was conducted over the phone. (Def's Stmt at PageID 196). Plaintiff stated during the Intake Interview with the MDCR:

> On August 27, 2018, I had an emphysema attack [in] the morning before work. I used my inhaler medication and then went to work, but I was still not feeling well.

10

> I felt like I could not breathe well, so I took my shirt off. My foreman, Jeremy, told me that I had to [put my shirt] back on. I became upset and put my shirt on by ripped into a V neck. After this, I had a meeting with HR in which it was pointed out instances where my behavior had been threatening, destructive, intimidating and I had used curse words. One of the side effects of the medication I take for my neck injury is irritability and anger. I informed my employer about my disability a year ago and believe this was a factor in my discharge.

(ECF No. 23-22, at PageID 416).

On December 26, 2018, Plaintiff personally appeared at the EEOC's Office in Lansing and signed a formal Charge of Discrimination. (Def's Stmt at PageID 196). On his Charge of Discrimination, which he signed under penalty of perjury, Plaintiff only alleged that he was discharged, and he believed that his disability was a factor in his discharge. (ECF No. 23-23, at PageID 420).

Terex submitted its position statement on February 28, 2019, addressing only the allegations of disability-based discriminatory discharge. (Def's Stmt at PageID 197).

On October 2, 2019, Plaintiff sent an email to the MDCR investigator to inquire about the status of his charge. (ECF No. 23-25, at PageID 427). Plaintiff stated in the email:

> This month starts contract talks with the Union and Shop. Can you push this in the middle of the talks. This may fall under contracts rules. That all shop employees/grievances have to be resolved. I don't know if this would fall under that rule.

(ECF No. 23-25, at PageID 427).

The MDCR investigator's Final Investigative Report, dated October 5, 2019, only analyzed Plaintiff's disability-based wrongful discharge claim. (ECF No. 23-16). The Report concluded that the evidence was not sufficient to support a probable cause finding against Terex for unlawfully subjecting Plaintiff to discharge due to his disability. (ECF No. 23-16, at PageID 386). The MDCR dismissed the charge on October 11, 2019, and subsequently denied Plaintiff's appeal on January 13, 2020. (Def's Stmt at PageID 198).

11

Thereafter, the EEOC issued a Right to Sue notice on October 2, 2020, and Plaintiff commenced this action on December 21, 2020. (Def's Stmt at PageID 198).

## STANDARD OF REVIEW

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment carries the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

Further, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . ." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). "In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true . . . ." *Id*. (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

## ANALYSIS

**I. Plaintiff failed to exhaust administrative remedies for his failure to accommodate and his retaliation claims under the ADA.**

"A plaintiff seeking to bring employment discrimination claims under the ADA must first exhaust administrative remedies, and failure to properly exhaust is an appropriate dismissal of an ADA action." *Jones v. Natural Essentials, Inc.*, 740 Fed. App'x. 489, 492 (2018). To properly exhaust administrative remedies under the ADA in a state (such as Michigan), which has enacted its own laws prohibiting discrimination in employment, "a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination." *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000) (citing 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1)). "A plaintiff must then obtain a right-to-sue letter from the EEOC before she can bring suit under the ADA." *Jones*, 740 Fed. App'x at 493.

"The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (quoting 29 C.F.R. § 1601.12(b)). As a general rule, an ADA plaintiff "cannot bring claims in a lawsuit that were not included in his EEOC charge." *See* 42 U.S.C. § 2000e-5(f)(1); *Younis*, 610 F.3d at 361. . However, "because aggrieved employees – and not attorneys – usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.* at 362 (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006). Accordingly, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing a

suit on that claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010); *see also Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998). The Sixth Circuit has referred to this as the "expected scope of investigation test." *See Wiegel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 380-81 (6th Cir. 2002).

Here, on the Charge of Discrimination, Plaintiff stated in-full: "On August 29, 2019, I was discharged by representatives of [Terex], allegedly due to behavioral issues. [Terex] was aware of my disability, and I believe this was a factor in my discharge." (ECF No. 23-23). Plaintiff further identified the ADA and PWDCRA as the laws that his complaint was based upon. (ECF No. 23-23).

Terex argues that Plaintiff should be foreclosed from pursuing his ADA failure to accommodate and retaliation claims because "Defendants had no notice of [those claims.]" (ECF No. 23, at PageID 199-200).

## A. Failure to Accommodate Claim

Plaintiff does not dispute that the charge of discrimination does not specifically include a failure to accommodate claim. (ECF No. 27, at PageID 446). Instead, Plaintiff argues that "a pro per, clearly, could have believed that a claim of failure to accommodate would be within his charge of disability-based discrimination." (ECF No. 27, at PageID 445).

In *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000), the plaintiff's EEOC "charge did not explicitly allege that [plaintiff] failed to accommodate her disability" in violation of the ADA. *Id*. Rather, like Plaintiff here, the *Jones* plaintiff's EEOC charge "specifically alleged only a termination claim[.]" *Id*. The *Jones* court also noted that the plaintiff only provided the date of her termination as the date of discrimination and not "the date of the alleged failure to

14

accommodate." *Id*. at 854. The Sixth Circuit held that the plaintiff failed to exhaust her administrative remedies related to her failure to accommodate claim because "[a] termination claim differs in kind and date from an accommodation claim." *Id*. at 854. The Sixth Circuit applied this same reasoning more recently in *Perry v. American Red Cross Blood Services*, 651 Fed. App'x 317, 324 (6th Cir. 2016):

> Like the EEOC charge at issue in *Jones*, Perry's charge does not mention failure to accommodate, nor does it list any dates other than the date of her termination. Accordingly, Perry has failed to exhaust her administrative remedies for an ADA-accommodation claim, and we lack subject-matter jurisdiction.

*Id*.

Here, Plaintiff specifically and singularly alleged that he believed his disability was "a factor in [his] discharge." (ECF No. 23-23). His charge does not mention a failure to accommodate. (ECF No. 23-23). His charge also does not list any other days other than the date of his termination. (ECF No. 23-23). The Sixth Circuit has specifically held that "the inclusion of a single date, identified only as the last day of work, does not trigger an investigation into whether [a plaintiff] was injured on that date as a result of a failure to accommodate." *Jones*, 209 F.3d at 854.

Plaintiff further argues that, under the expected scope of investigation test, the information he provided to the MDCR in his intake interview and rebuttal statement "should, at least, have been enough to cause the investigator to question whether the request for a loose shirt was a reasonable accommodation which was denied." (ECF No. 27, at PageID 446)  However, according to the MDCR's investigator's notes:

> [Plaintiff] stated the supervisor did talk with [Plaintiff] about it and [Plaintiff] agreed that sitting in the air-conditioned area was good enough and that he only needed a moment to catch his breath. [Plaintiff] also stated the supervisor asked [Plaintiff] if he was medically fit to run his machine on the 29th and [Plaintiff] told him yes.

(ECF No. 23-16). This would not cause the MDCR/EEOC to investigate a failure to accommodate claim because Plaintiff stated that the accommodation offered "was good enough[.]" (*See* ECF No. 23-23).

Furthermore, the Court is not convinced that Plaintiff can use the intake interview and rebuttal statement in this way. The relevant caselaw consistently refers to the *charge of discrimination* as the guiding document. *See Jones*, 209 F.3d at 854; Perry, 651 Fed. App'x at 324; *Younis*, 610 F.3d at 361; *Wiegel*, 302 F.3d at 380-81. The parties did not provide the Court with authority supporting the assertion that additional documents involved with MDOC/EEOC's investigation can be used for the expected scope of investigation test. Regardless, even if the intake interview and rebuttal statement could be used, the Court does not find that they would cause the MDOC or EEOC to investigate a failure to accommodate claim.

While EEOC charges are meant to be liberally construed, the Sixth Circuit precedent is clear: "the liberal construction to be given charges filed by lay complainants pertains to legal and procedural technicalities. It cannot extend to include facts and claims not alleged." *Jones*, 209 F.3d at 854. As such, Plaintiff has failed to exhaust his administrative remedies regarding his failure to accommodate claim, and the Court lacks jurisdiction over his ADA failure to accommodate claim.

**B. Retaliation Claim**

Plaintiff also does not dispute that he did not specifically make a retaliation claim in his EEOC charge, but instead argues that his retaliation claim was within the expected scope of the investigation. (ECF No. 27, at PageID 446-450).

The Sixth Circuit has suggested that under the expected scope of investigation test, "retaliation naturally grows out of any underlying substantive discrimination charge, making a

16

retaliation claim foreseeable to defendants." *Weigel*, 302 F.3d at 380 (quoting *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999). In other words, a retaliation claim is within the expected scope of investigation when the discrimination charge includes facts relating to earlier complaints of discrimination prior to the claimed adverse employment action. *Id*. at 830 ("Moreover, Weigel's EEOC charge included facts relating to both BHET's refusal to rehire Weigel and to the allegedly discriminatory treatment she received while previously employed at BHET.")

Here, Plaintiff's discrimination charge did not include facts relating to earlier complaints of discrimination. It simply stated that (1) Plaintiff was discharged, allegedly due to behavioral issues; (2) Defendants knew of Plaintiff's disability, and (3) Plaintiff believed his disability was a factor in his discharge. (*See* ECF No. 23-23). The charge did not include earlier complaints of discrimination prior to the discharge. Read fairly, his charge would not put the EEOC on notice of a retaliation claim. Instead, it suggests that that Plaintiff was terminated because he was disabled, but not because he had previously complained of discrimination. *See Kerwin v. Community Action Agency*, Case No. 20-12160, 2022 WL 1430976, at *3 (E.D. Mich. May 5, 2022) (holding that the plaintiff's EEOC charge "was not sufficiently clear to prompt the EEOC to investigate a claim of ADA retaliation").

As with the failure to accommodate claim, Plaintiff did not include facts or claims that would prompt an investigation into a relation claim. As such Plaintiff, Plaintiff has failed to exhaust his administrative remedies regarding his retaliation claim, and the Court lacks jurisdiction over his ADA retaliation claim.

In conclusion, the Court GRANTS Defendants' motion for summary judgment as to his failure to accommodate claim under the ADA in Count I and his retaliation claim under the ADA in Count III because Plaintiff failed to exhaust his administrative remedies as to those claims.

## II. The Labor Management Relations Act does not preempt Plaintiff's wrongful termination and retaliation claims under the PWDCRA.

Defendants argue that Plaintiff's disability discrimination in violation of the PWDCRA claim (Count II) and retaliation in violation of the PWDCRA claim (Count IV) are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA"). Defendants make this argument because "[c]laims brought under § 301 of the LMRA are subject to the six-month statute of limitations period of § 10(b) of the National Labor Relations Act." *Plunkett v. Smurfit-Stone Container Corp.*, 247 F. App'x 604, 606 (6th Cir. 2007). Consequently, Defendants argue that Count II and Count IV should be dismissed because they are preempted by the LMRA and thereby subject to the six-month statute of limitations. (ECF No. 23, at PageID 204).

Section 301 of the LMRA preempts any state-law claim arising from a breach of collective bargaining agreement. *Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004). "This rule is necessitated by the need for uniformity and predictability in interpreting the meaning of contract terms." *DeCoe v. General Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994).

The Sixth Circuit has developed a two-step approach for determining whether Section 301 preemption applies to a state law claim. *Id*. First, "courts must consider whether resolving the state law claim would require interpretation of the collective bargaining agreement." *Mattis*, 355 F.3d at 906. Second, "courts must ascertain whether the rights claim by the plaintiff were created by the collective bargaining agreement, or instead by state law." *Id*. "In short, if a state-law claim fails either of these two requirements, it is preempted by § 301." *Id*. The Sixth Circuit has also noted

18

that "where a plaintiff's state-law claims cannot be directly connected to the terms of the CBA, they are not preempted," and that "merely consulting a CBA in the course of adjudicating state law claims is not enough." *Valinski v. Edison*, 197 Fed. App'x 403, 409 (6th Cir. 2006).

"In order to make the first determination, the court is not bound by the 'well-pleaded complaint' rule, but rather looks to the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort." *DeCoe*, 32 F.3d at 216. "If the plaintiff can prove all the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement." *Id*. "Moreover, neither a tangential relationship to the CBA, nor the defendant's assertion of the contract as an affirmative defense will turn an otherwise independent claim into a claim dependent on the labor contract." *Id*.

The PWDCRA prohibits employers from "discharg[ing] or otherwise discriminat[ing] against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individuals ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202.

Defendant argues that to determine whether the alleged misconduct was pretextual "requires this Court to interpret the 2016 Collective Bargaining Agreement between Terex and the UAW to determine whether Plaintiff has met his ultimate burden on pretext." (ECF No. 23, at PageID 204).

While the Court may consult the CBA in the course of determining whether there was pretext, that is not enough to preempt a state law claim under Section 301. *See Valinski*, 197 Fed. App'x at 409. Indeed, the Supreme Court has emphasized that "substantive rights in the labor

relations context can exist without interpreting collective-bargaining agreements" *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 410-11 (1989). Furthermore, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 . . . " *Allis-Chalmers v. Lueck*, 471 U.S. 202, 211 (1985). "[I]t would be inconsistent with congressional intent under [Section 301] to preempt state rules that . . . establish rights and obligations, independent of a labor contract." *Id*. at 212. "As long as federal law is the basis of interpreting CBAs, states may still provide workers with substantive rights that do not depend upon an interpretation of the CBA for their adjudication." *Valinski*, 197 Fed. App'x at 410 (citing *Lingle*, 486 U.S. at 409).

As for the second determination, the right asserted by Plaintiff – the right to be free of disability discrimination – is created by the PWDCRA, not the CBA. *See* Mich. Comp. Laws. § 37.1202.

Therefore, Plaintiff's PWDCRA claims in Count II and Count IV are not preempted by the LMRA.

## III. Defendants did not terminate Plaintiff because of his disability.

In this case, Plaintiff asserts disability discrimination claims based upon termination under both the ADA (Count I) and the PWDCRA (Count II). (*See* ECF No. 1). The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra*, 667 F.3d 757, 764 (6th Cir. 2012). As such, the Court will only address Plaintiff's PWDCRA claims where the standard differs from the ADA.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. 12112(a). An employer discriminates against an employee by taking an adverse action, such as suspension or discharge, against the employee because of his disability. *Id*. Intentional discrimination claims can be proven by direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (2012).

## A. Direct Evidence

 "In discrimination cases, direct evidence is that evidence which, if believed, *requires the conclusion* that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko*, 689 F.3d at 650 (emphasis added) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Ondricko*, 689 F.3d at 650 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Here, the thrust of Plaintiff's position is that there is direct evidence of discrimination because he was terminated for not obeying orders, but he only defied the orders because he was disabled. (ECF No. 27, at PageID 455). Plaintiff argues, "All of the conduct that Terex has identified as 'violations' of 'Shop Rules 8, 15, 19, 29, 30, and 34' *boils down to* Tobias's requests for accommodations of his disability, or complaints about management's failure to provide same." (ECF No. 27, at PageID 455) (emphasis added). However, in this argument, Plaintiff merely describes circumstantial evidence, not direct evidence. Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable

21

inference that discrimination occurred." *Ondricko*, 689 F.3d at 648-649. Whereas direct evidence "requires the conclusion" of discrimination. *Id*. at 650. The fact that the Court would need to "boil down" the violations of the Shop Rules to arrive at the conclusion that discrimination occurred means that there is no direct evidence of discrimination.

## B. Circumstantial Evidence

Where a plaintiff does not have direct evidence of discrimination, but instead is relying on circumstantial evidence, the familiar burden-shifting framework of *McDonnell Douglas* governs a claim of disability discrimination based upon an adverse action such as termination. *Shoemaker v. E.I. DuPont de Nemours and Co.*, 405 F. App'x 16, 18 (6th Cir. 2010); *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012). Under this framework, first the plaintiff must establish a prima facie case of disability discrimination. *Shoemaker*, 405 F. App'x at 18. If he satisfies that obligation, the burden shifts to the employer to offer a "legitimate nondiscriminatory" reason for its challenged action. *Id*. If the employer does so, the burden shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for unlawful discrimination. *Id*.

To state a prima facie case of employment discrimination through indirect evidence under the ADA, Plaintiff must establish that: (1) he is an individual with a disability; (2) that he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 58-59 (6th Cir. 2011).

"Furthermore, the disability must be a 'but-for' cause of the adverse employment action." *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 306 (6th Cir. 2016).

Defendants do not directly dispute whether Plaintiff has met his prima facie burden, but rather focuses their analysis "on Plaintiff's failure to meet his ultimate burden to show that his alleged disability was a 'but-for' cause of his discharge." (ECF No. 23, at PageID 206).

Defendants argue that they articulated a legitimate, nondiscriminatory reason for Plaintiff's discharge. (ECF No. 23, at PageID 206). Specifically, Defendants assert that "Terex terminated Plaintiff for his repeated acts of insubordination and for maliciously accusing his supervisors of ignoring safety in a threatening and intimidating manner that cause considerable disruption in the workplace, all in violations of Shop Rules 8, 15, 19, 29, 30, and 34." (ECF No. 23, at PageID 207). As such, the burden shifts to Plaintiff to demonstrate that this reason was pretextual.

A plaintiff can establish pretext by showing: "(1) that the proffered reasons had no basis in in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320. "[T]he employee may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id*.

At the summary judgment stage of the litigation, the employee "need not *prove* that the employer's proffered rational is pretextual, as that would be enough proof for summary judgment in favor of the employee." *Id*. (quoting *Whitfield*, 639 F.3d at 260 (6th Cir. 2011). "Rather, the employee must prove only enough to create a *genuine issue* as to whether the rationale was

pretextual." *Id*. Plaintiff must provide evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020).

> Plaintiff argues that Defendants' stated reason was pretextual because:
>
> Plaintiff is aware of at least one employee, Eric Hall, who got into an argument with a supervisor but was not discharged. The disparate treatment, coupled with the circumstances identified above, certainly suggest that Plaintiff's actions on August 28th and 29th were insufficient to motivate the termination.

(ECF No. 27, at PageID 457). This is the entirety of Plaintiff's argument as to pretext. Plaintiff does not elaborate further on the argument or support it with any authority.

As Defendants note, "[t]he record is devoid of any information regarding Eric Hall's alleged incident with an unnamed supervisor, and absolutely nothing in the record suggests that Eric Hall engaged in an act of comparable seriousness[.]" (ECF No. 30, at PageID 483). There is little reason to believe that disability discrimination more likely motivated Defendants' decision to fire Plaintiff than his history of insubordination and his refusal to put on a work-appropriate shirt on August 28 and 29, 2018. Plaintiff's conclusory argument regarding Eric Hall is not enough to create a genuine issue as to whether the rationale was pretextual.

Therefore, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's ADA (Count I) and PWDCRA (Count II) discrimination claims with respect to his termination.

**IV. Defendants did not fail to reasonably accommodate Plaintiff.**

Plaintiff alleges that Defendants failed to reasonably accommodate him under the ADA in Count I and under the PWDCRA in Count II. However, the reasonable accommodation claim under the ADA in Count I has already been dismissed above because Plaintiff did not include it in

his EEOC charge and thereby failed to exhaust his administrative remedies for that claim. As such, the Court shall address the reasonable accommodation claim under the PWDCRA in Count II.

Similar to the ADA, the PWDCRA requires that employers make accommodations for people with disabilities, unless the employer demonstrates that the accommodation would impose an undue hardship. Mich. Comp. Laws § 37.1102.

In order to establish a prima facie case for failure to accommodate under the circumstantial evidence framework, Plaintiff must show that: (1) he is disabled within the meaning of the Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) Defendants knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Defendants failed to provide the necessary accommodation. *Johnson v. Cleveland City School Dist.*, 443 Fed. App'x 974, 982-83 (6th Cir. 2011). Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to show that accommodating plaintiff would impose and undue hardship on the operation of its business." *Keith v. Cnty of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

Here, Defendants argue that Plaintiff has failed to meet his burden on the third, fourth, and fifth elements.

Regarding the third element – whether Defendants knew or should have known about Plaintiff's disability, Plaintiff argues that on August 28, 2018, Plaintiff told his managers about his COPD and emphysema and "they probably knew about it because of their observing him taking his inhalers for years before." (ECF No. 27, at PageID 456). Defendants argue that they did not know about his disability because Plaintiff never provided them with medical documentation of his COPD and emphysema. (ECF No. 23, at PageID 211).

25

"An employer has notice of the employee's disability when the employee tells the employer that he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). The Sixth Circuit has held that "[k]nowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability." *Niles v. Givaudan Flavors Corp.*, 521 Fed. App'x 364, 369 (6th Cir. 2013). "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon*, 165 F.3d at 450.

Here, while Plaintiff did not provide medical documentation, Plaintiff testified that he "told Kevin Kelly years before that that I had emphysema and COPD." (ECF No. 23-2, at PageID 255). On August 28, 2018, Plaintiff told Kelly that he was having a COPD or an emphysema attack. (ECF No. 23-2, at PageID 271). This is enough to create a genuine issue of material fact as to whether Defendants knew or should have known of Plaintiff's disability. Defendants have not provided the Court with any authority to support their position that medical documentation is necessary in order for them to have known about Plaintiff's disability.

Regarding the fourth element – whether Defendant requested an accommodation, Sixth Circuit case law "establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge v. Landscape Forms, Inc.*, 592 Fed. App'x 403, 407 (6th Cir. 2014). Employees are not required "'to use the magic words 'accommodation' or even 'disability.'" *Id.* (quoting *Leeds v. Potter*, 249 Fed. App'x 442, 449 (6th Cir. 2007). However, "the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.* The employee "must make it clear that the request is being made because of the employee's disability." *Id.* Furthermore, "[t]he employee bears the burden of proposing reasonable accommodations; an employee's claim must

26

be dismissed if the employee fails to identify and request such reasonable accommodations." *Johnson*, 443 Fed. App'x at 983.

It is undisputed that Plaintiff did not request an accommodation for his COPD or emphysema until August 28, 2018. (Def's Stmt at PageID 187).

On August 28, 2018, Plaintiff came to work not wearing a shirt under his bib overalls. (ECF No. 23-2, at PageID 262). Plaintiff told Kelly that he was having a COPD or emphysema attack. (ECF No. 23-2, at PageID 271). Kelly asked Plaintiff if he would put a shirt on and Plaintiff said he would when he returned to his workstation. (ECF No. 23-2, at PageID 271). When Plaintiff returned to his workstation, he turned the fan on above his head but did not put his shirt back on. (ECF No. 23-2, PageID 271). When Kelly returned to Plaintiff's workstation, Plaintiff was still not wearing a shirt, and Kelly asked Plaintiff if he wanted to go to the air-conditioned office to help him cool off. (ECF No. 23-2, at PageID 271). Plaintiff declined "because the fan was doing [him] so much better[.]" (ECF No. 23-2, at PageID 271). Kelly again reminded Plaintiff that he needed to wear a shirt while he was at his workstation. (ECF No. 23-2, at PageID 191). In response, Plaintiff ripped the shirt down its sides and neck and put the ripped shirt on. (ECF No. 23-2, at PageID 271). Kelly told Plaintiff that the ripped shirt did not meet the dress code, and eventually Plaintiff was sent home to return with a proper shirt. (Def's Stmt at PageID 192). Plaintiff did indeed return to work with another shirt with both sides intact and relatively shallow tear at the neck. (Def's Stmt at PageID 192). There was no further incident on August 28, 2018.

Plaintiff argues that "Plaintiff's statement that he was having breathing issues, and requests regarding same on the 28th, was sufficient to advise the Defendant of his disability and to count as a request for accommodations for same." (ECF No. 27, at PageID 458). However, the record

27

does not indicate that Plaintiff *requested* anything specific on August 28, 2018. While Plaintiff did not need to use the magic words "accommodation" or "disability," he still needed to communicate a clear enough request so that Defendants did not need to speculate as to the extent of the desired accommodation. *See Judge*, 592 Fed. App'x at 407. When Plaintiff was asked to identify the accommodation he was seeking in his deposition, he said that the accommodation he requested was "leaving me alone; just let the fan do what it needed for me at that time" and permitting him to wear a loose-fitting shirt. (ECF No. 23-2, at PageID 271).

However, even if Plaintiff's actions by not following the dress code constitutes a sufficient request for an accommodation, there is nothing in the record to support the conclusion that Defendants failed to provide the necessary accommodation. While Defendants did not permit Plaintiff to not wear a shirt at all or to wear a shirt torn down the sides and neck, Defendants had no problem with Plaintiff leaving the worksite to change into a loose tank top with a moderately torn neckline with the sides intact. (Def's Stmt at PageID 192). As for Plaintiff's request that Kelly leave him alone and let the fan cool him off, Kelly offered to have Plaintiff sit in the air-conditioned office. (ECF No. 23-2, at PageID 271). Kelly merely did not permit Plaintiff to sit without a shirt at his workstation around the machinery. (ECF No. 23-2, at PageID 191). "If denied a requested accommodation, an employee cannot force his employer to provide that specific accommodation if the employer offers an alternative reasonable accommodation." *Tennial*, 804 F.3d at 307. Here, Kelly offered an alternative reasonable accommodation by offering Plaintiff to sit in the air-conditioned office. Plaintiff argues that this was an inappropriate accommodation because "Plaintiff could not operate his machine or work from the office." However, Plaintiff defeats this argument with his very next sentence: "However, had he been permitted to wear the looser shirt,

he would be." (ECF No. 27, at PageID 459). Again, Plaintiff was permitted to wear a loose shirt – just not one that was so torn that it exposed most of his torso.

Therefore, the Court finds that even if Plaintiff's actions constituted a request for a reasonable accommodation, Defendants did not fail to accommodate Plaintiff. As such, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's failure to accommodate claim under the PWDCRA in Count II.[1]

**V. Defendants did not retaliate against Plaintiff.**

Plaintiff alleges that Defendants retaliated against him under the ADA in Count III and under the PWDCRA in Count IV. However, the retaliation claim under the ADA in Count III has already been dismissed above because Plaintiff did not include it in his EEOC charge and thereby failed to exhaust his administrative remedies for that claim. As such, the Court shall address the retaliation claim under the PWDCRA in Count IV.

Section 602(a) of the PWDCRA provides that a person or persons shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. § 37.1602(a).

**A. Direct Evidence**

Similar to his unlawful termination claim, Plaintiff also argues that he has direct evidence of retaliation "because the only reason the Defense has stated for his termination was related directly to his protected activity." (ECF No. 27, at PageID 460). Plaintiff argues that because his

---

[1] The Court notes that Plaintiff did not allege that Defendants failed to engage in the interactive process under the PWDCRA in Count II.

termination was based upon his refusal to put on a shirt that "[o]n its face, the decision was made due to protected conduct." (ECF No. 27, at PageID 460).

The stated reason for Plaintiff's termination in the Corrective Action Report was because Plaintiff violated Shop Rules. The Corrective Action Report gives the following factual descriptions for each violated Shop Rule:

> Shop Rules #29/#30/#15: Threatened Operations Mgr. on August 28 & 29 – HR Mngr on August 28 – Interfering with Supervisor and other Team Members.
>
> Shop Rules #34: Statements made to supervisor and Operations Manager for harassment and disregard for his personal hea[l]th
>
> Shop Rules #8/#19: Refusing to put a shirt on when told by his supervisor

(ECF No. 23-20, at PageID 409). As discussed above, "[d]irect evidence is evidence, which believed, does not require any inferences to conclude that unlawful discrimination motivated the action or decision." *E.F. by Fry v. Napoleon Community Schools*, 2019 WL 4370738, *10 n.5 (E.D. Mich. Sept. 25, 2019). The Corrective Action Report does not show – without inferences – that unlawful disability discrimination motivated Defendants' termination of Plaintiff.

As such, the Court must analyze Plaintiff's retaliation claim under the *McDonnell-Douglas* burden shifting framework for circumstantial evidence.

## B. Circumstantial Evidence

*i. Prima Facie Case*

To make out a prima facie case of retaliation, Plaintiff must demonstrate that (1) he engaged in protected activity under the PWDCRA; (2) Defendants were aware of that activity; (3) Defendants took an employment action adverse to Plaintiff; and (4) there was a causal connection

between the protected activity and the adverse action. *Aho v. Department of Corrections*, 263 Mich. App. 281, 688 N.W.2d 104, 108-109 (2004).

Here, Defendants do not dispute that Plaintiff has met the second and third elements of retaliation under the PWDCRA. Therefore, only two elements – protected activity and causal connection – are in dispute.

*Protected Activity.* Protected activities under the PWDCRA are: (1) opposing a violation of the PWDCRA, or (2) making a charge, filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing under the PWDCRA. *See* M.C.L. § 37.1602(a). "Thus, if a person satisfies the requirements under either of these two prongs of M.C.L. § 37.1602(a), then the person is said to be engaged in a 'protected activity.'" *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 653 N.W.2d 415, 435 (2002).

Plaintiff alleges he engaged in an activity protected by the PWDCRA when he:

a. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on or about August 28, 2018,

b. Complained to Kevin Kelly about perceived disability-discrimination on August 29, 2018,

c. Complained to other management about Kevin Kelly's ongoing disability discrimination and harassment on August 29, 2018,

d. Requested accommodations for his disability, by being permitted to wear loose-fitting clothing during a flare-up, on August 29, 2018.

(ECF No. 1, at PageID 18).

As established above, the Court is not convinced that Plaintiff's actions on August 28 and 29, 2018 constitute "requesting an accommodation." However, both state and federal courts have recognized that "'complaining to anyone (management, unions, other employees, or newspapers)

31

about allegedly unlawful practices' is a valid form of opposition." *Watkins v. Saginaw's Famous Fried Chicken, LLC*, No. 337288, 2018 WL 2165356, at *3 (Mich. Ct. App. May 10, 2018) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)).

The record does not provide a clear picture regarding Plaintiff's complaints to Kelly and other management. However, Plaintiff testified that during the morning safety meeting on August 29, 2018, Plaintiff confronted Kelly and told him that "[Kelly] really didn't believe in safety" and that Plaintiff thought that Kelly should have called 911 the previous day in response to Plaintiff's breathing issues. (ECF No. 23-2, at PageID 263). Kelly sent an email to Weaver regarding this confrontation and described the incident as follows:

> Wednesday morning around 7:05 am Len started yelling toward me I harassed him and denied him medical treatment and that this company has gave him his mental health issues and repeated 2 or 3 times that I had harassed him. I said nothing to him at that point thinking it would only make things worse.

(ECF NO. 23-18, at PageID 395).Viewed in the light most favorable to Plaintiff, this confrontation with Kelly could be considered a protected activity.

*Causal Connection.* "To establish a casual connection, a plaintiff must demonstrate that his participation in the protected activity was a "significant factor" in the employer's adverse employment action, not merely that there was a casual link between the two events." *Aho*, 688 N.W.2d at 109. "Thus, mere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such action and the protected activity." *Id*.

"A casual connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory

basis." *Rymal v. Baergen*, 262 Mich. App. 274, 303 686 N.W.2d 241 (2004). "Something more than a temporal connection between the protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation in claimed." *West v. General Motors Corp.*, 469 Mich. 177, 665 N.W.2d 468, 473 (2003).

Here, the protected activity – Plaintiff complaining to Kelly – occurred on the same day he was terminated, so there was close temporal proximity between the protected activity and the adverse action. Furthermore, in the Corrective Action Report, Defendants list "Statements made to supervisor and Operations Manager for harassment and disregard for his personal hea[l]th" as one of the factual basis for Plaintiff's termination. (ECF No. 23-20, at PageID 409). From this, a reasonable fact finder could find that Plaintiff's complaints to Kelly was a "significant factor" in his termination.

Therefore, Plaintiff has established a prima facie case of retaliation.

*ii. Legitimate Business Reason for Discharge*

"If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate business reason for discharge." *Aho*, 688 N.W.2d at 109. "If the defendant provides such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge." *Id*. Furthermore, "the fact that plaintiff engaged in a protected activity under the PWDCRA does not immunize him from an otherwise legitimate or unrelated adverse employment action." *Id*. at 111 (citing *West*, 665 N.W.2d at 743.

Here, Defendants have provided a legitimate business reason for discharge: repeated acts of insubordination and threatening, intimidating, and disruptive behavior in the workplace. (ECF No. 23, at PageID 219; ECF No. 23-20, at PageID 409).

In his brief, Plaintiff did not specifically address whether this Defendants' stated reason for discharge was pretextual with regards to his retaliation claim. (ECF No. 27, at PageID 459-462). And as addressed above, Plaintiff's conclusory argument as to Eric Hall is not enough to create a genuine issue whether the Defendants' stated rationale for his termination was pretextual.

Furthermore, the record does not support a finding that this reason was pretextual. Later in the day, after Plaintiff confronted Kelly during the morning safety meeting, Kelly discovered that he had holes in his shirt around his nipples. (ECF No. 23-2, at PageID 264). Plaintiff refused to go home and come back wearing a shirt without holes. (ECF No. 23-17, at PageID 393). Consequently, Kelly directed Plaintiff to accompany him to Human Resources because he would not change his shirt. (ECF No. 23-17, at PageID 393). Plaintiff testified that he blew up and talked loudly during the meeting. (ECF No. 23-2, at PageID 265). After that, Plaintiff was placed on suspension pending investigation, which was later converted to a termination. (Def's Stmt at PageID 195). This does not support the finding that Defendants terminated Plaintiff because of his complaints to Kelly or other management, but rather because Plaintiff repeatedly defied Defendants' directives to put on an appropriate shirt in accordance with the dress code and then "blew up" during the meeting with HR.

Therefore, the Court finds that Defendants did not retaliate against Defendant and GRANTS Defendants' motion as to his retaliation claim under the PWDCRA in Count IV.

**CONCLUSION**

For the reasons explained above, the Court **GRANTS** Defendants motion for summary

judgment and **DISMISSES** this action with prejudice.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 25, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 25, 2022, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager

35